Marc J. Randazza, Esq., FL Bar #625566
mjr@randazza.com
Jason A. Fischer, FL Bar #68762
jaf@randazza.com
Randazza Legal Group
2 S. Biscayne Blvd., Suite 2600
Miami, FL 33131
(888) 667-1113
(305) 437-7662 fax

Attorneys for Plaintiff,
Liberty Media Holdings, LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LIBERTY MEDIA HOLDINGS, LLC<br><br>Plaintiff,<br><br>vs.<br><br>SERGEJ LETYAGIN, d/b/a<br>SUNPORNO.COM, IDEAL CONSULT,<br>LTD., "ADVERT", "CASTA",<br>"TRIKSTER", "WORKER", "LIKIS",<br>"TESTER" and DOES 1-50<br><br>Defendants | Case No. 11-cv-62107-KMW<br><br>**REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, ORDER FOR SEIZURE AND APPOINTMENT OF RECEIVER, AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |

**REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, ORDER FOR SEIZURE AND APPOINTMENT OF RECEIVER, AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

Plaintiff Liberty Media Holdings LLC ("LMH" or "Liberty"), through its undersigned counsel, hereby replies to Defendants Sergej Letyagin, d/b/a SunPorno.com and Ideal Consult, Ltd.'s (hereinafter, the "Defendants[']") Response (Doc. 42) (hereinafter, the "Response") to LMH's underlying Motion for a Temporary Restraining Order and other relief (hereinafter, the "Motion") (Doc. 37) as follows.

**I.      INTRODUCTION**

On December 9, 2011, Liberty filed its motion for a temporary restraining order (Doc. 37), seeking the Court's assistance in preventing what Liberty believes to be fraudulent transfers of Defendants' assets located within this judicial district. Defendants filed their response in opposition the Motion (Doc. 42),

asserting that because jurisdiction has not been established over the Defendants, then the Court has no basis for encumbering Defendants' assets. Defendants further suggest that their conduct, in transferring domain name properties outside of the U.S. after Liberty filed suit, was part of a larger strategy to change service providers, which had begun before Liberty's complaint became public record. Finally, Defendants argue that this Court should refrain from granting Liberty its requested TRO because the Court has no subject matter jurisdiction over activities which Defendants claim occurred entirely outside of the United States.

At oral argument in this matter, the Court correctly noted that the relief requested by Liberty was extreme, given the minimum amount of factual development by the parties concerning Defendants' transfer of its domain names away from Moniker Online Services – a registrar located within this judicial district – to registrars located outside the United States. After hearing the presentation of the parties' counsel, the Court declined to grant Liberty's request to appoint a receiver for purposes of unwinding the domain name transfers, but expressing some concern as to the timing and motivation of Defendants' domain name transfer. The Court further took Liberty's motion under advisement to the limited extent that it concerned Sunporno.com – i.e., the domain name actually used by Defendants for the conduct alleged in Liberty's complaint.

After filing its complaint, Liberty's counsel notified Moniker that there was a pending legal dispute concerning Sunporno.com and asked that the domain name be transfer locked pending the outcome of the action. See Doc. 42-2. In response, Moniker has – per its internal policies – placed a hold on the domain name, which temporarily prevents Defendants' from moving it to another registrar. However, Moniker is not under any legal obligation at this time to keep this hold in place and may, absent instructions from this Court to the contrary, permit Defendants' to move Sunporno.com to another registrar outside of the United States, as they have done with the other domain names in their portfolio. In such an event, Liberty will be robbed of any chance for relief, either equitable or legal.

For the reasons stated at oral argument and more particularly below, this Court should issue an order maintaining the status quo. Moniker and Defendants should be ordered to leave the Sunporno.com domain name registration undisturbed until such time as this matter may be resolved on its merits.

II.     ARGUMENT

This case is properly before the Court. Contrary to Defendants' claims, the jurisdiction for this matter is predicated on Fed. R. Civ. P. 4(k)(2), and not Florida's long-arm statute. In fact, nowhere in Liberty's

Complaint or First Amended Complaint (Docs. 1, 24) did the Plaintiff even mention Florida's long-arm statute. The reason for this is not carelessness – rather, the jurisdiction for this action simply is not based upon Florida's long-arm statute. If injunctive relief is not award by this Court, the Defendants will continue their practice of slipping away into the darkness, fortified by the international borders of countries not as accommodating of United States Copyright Law (Docs. 37-2; 42; 42-3 ¶¶ 17-18).

> A. **Plaintiff Bases Jurisdiction in This Case on Fed. R. Civ. P. 4(k)(2), Rather than Florida's Long-Arm Statute.**

Under 28 U.S.C § 1391(d), a foreign defendant may be sued in any judicial district ("An alien may be sued in any district"), and Fed. R. Civ. P. 4(k)(2) provides for federal personal jurisdiction in cases such as this. Rule 4(k)(2) acts as a "federal long-arm statute." *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 36 (1st Cir. 1999). The Advisory Committee Notes to Fed. R. Civ. P. 4(k)(2) explain the purpose of the Rule. This Rule was enacted to:

> Correct the gap in the enforcement of federal law. Under the former rule, a problem was presented when the defendant was a non-resident of the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction. In such cases, the defendant was shielded from the enforcement of federal law by the fortuity of a favorable limitation on the power of state courts, which was incorporated into the federal practice by the former rule.

As the United States Court of Appeals for the Fifth Circuit has explained:

> Rule 4(k)(2) thus sanctions personal jurisdiction over foreign defendants for claims arising under *federal law* when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state.

*World Tanker Carriers Corp.* v. *MV & YA Mawlaya*, 99 F.3d 717, 720 (5th Cir. 1996); see also *Nartron Corp. v. Quantum Research Grp. Ltd.,* 473 F. Supp. 2d 790, 797 (E.D. Mich 2007). In *Sunshine Dist., Inc. v. The Sports Authority Michigan, Inc.,* 157 F. Supp. 2d 779, 788 (E.D. Mich. 2001), this court dealt with this very issue.

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

> Jurisdiction is proper (1) if the plaintiff's claim arises under federal law, (2) the putative defendant must be beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction must not offend the United States Constitution or other federal law.

*Sunshine Dist., Inc.*, 157 F. Supp. 2d at 788.

The analysis under the first prong is simple: This case is a copyright infringement case, thus it arises under federal law. Copyright is governed by title 17 of the U.S. Code, and federal courts have exclusive jurisdiction over copyright cases. 28 U.S.C. §1338(a).

### 1. The Defendants Are Beyond the Reach of Any State of General Jurisdiction.

The second prong is less simple. Had the Defendants acknowledged Rule 4(k)(2), they might have presented arguments relevant to whether jurisdiction is proper in another state. At this time, the Plaintiff is not privy to information that would satisfy the Court that any other state could exercise jurisdiction over the Defendants. However, the Plaintiff does not bear the burden under Rule 4(k)(2). "If . . . the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *ISI Int'l, Inc. v. Borden Ladner Gervais LLP,* 256 F.3d 548, 552 (7th Cir. 2001)*; see also Steven Henry Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004). "[A] piecemeal analysis of the existence *vel non* of jurisdiction in all fifty states is not necessary. Rather, so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *ISI Int'l. Inc.*, 256 F.3d at 552.

The Defendants fail to suggest an alternate forum, therefore the second prong is satisfied. Given that the portions of Rule 4(k)(2) which act analogously to a long-arm statute are resolved in favor of this Court asserting jurisdiction, we must simply turn to the question of whether it would offend due process to do so.

### 2. Jurisdiction in Florida would not Offend Due Process Because the Defendants Have Contacts With the United States and Florida.

"Under Rule 4(k)(2), the constitutional requirements are the same as with any other personal jurisdiction inquiry, i.e., relatedness, purposeful availment, and reasonableness, only in reference to the United States as a whole, rather than a particular state." *Id*.

> The defendant's national contacts take center stage because the rule applies only to situations in which federal courts draw jurisdictional authority from the federal sovereign (unreinforced by 'borrowed' state statutes), and, thus, the applicable constitutional

requirements devolve from the Fifth rather than the Fourteenth Amendment.

*World Tanker Carriers Corp*, 99 F.3d at 720.  Defendants have such pervasive and systematic business contacts in the United States that he is subject to general jurisdiction in the United States, not merely specific jurisdiction in this case.  Given Defendants' extensive contacts with the United States, they cannot seriously argue that they lacks minimum contacts with the forum nation, or that they could not reasonably anticipate being haled into court in the United States.  See Docs. 21-2, 21-3 (showing Defendants' considerable U.S. traffic); Exhs. B, C, and D (copies or which were provided to the Court during oral argument).

As of September 27, 2011, <sunporno.com> was registered to a Florida address with a Florida-based registrar.  Aside from the SunPorno website, Letyagin and the Defendants also own and operate several adult-oriented "tube" sites including <ah-me.com>, <twilightsex.com>, <boyfriendtv.com> and <ashemaletube.com>, all of which rely heavily on the United States for web traffic (Docs. 37-10 through 37-23).  It is no accident that the Defendants are being haled before a United States court in this case, as their business model is premised on operating abroad and broadcasting pirated works into the United States, hoping to bring challenges just like this one in order to frustrate the rights holders' enforcement of their copyrights.

### 3. The Defendants Have Purposefully Availed Themselves of the United States' Jurisdiction.

Defendants successfully cultivated the United States market for advertisers and enjoyed the United States market for both customers and contracting companies, thus establishing several jurisdictions in the United States.  Nevertheless, even if all of that were untrue, the SunPorno website itself was highly interactive and targeted at the United States (Docs. 1-10, 1-11, 21-4, 21-2, 21-3, 21-4, 21-5) thus specific jurisdiction is proper as well.

Tube sites like SunPorno are highly interactive. Federal law defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2); see *Carafano v. Metrosplash.com, Inc*., 207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002) (an online dating website is an "interactive computer service" under the CDA).  In fact, if this were not an intellectual property case, Section 230 would immunize the Defendants from suit, given its status as an interactive website. Clearly under *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, the Defendant's site at <sunporno.com> is at the most interactive end of the spectrum. 952 F. Supp. 1119 (W.D. Pa 1997).

B.  **The Facts in The Record Support the Conclusion That Significant Portions of the Infringement Took Place Inside the United States, thus Eliminating the Extraterritoriality Issue.**

At the time of filing, the Defendants had registered <sunporno.com> within the United States, as its WHOIS registrant was stated to reside in Pompano Beach, Florida (Doc. 37-1). Contrary to his declaration (Doc. 42-3 ¶ 4), Defendant Letyagin did personally own the domain name <sunporno.com> as late as August 31, 2011. Decl. of Jason A. Fischer, which is submitted herewith as Exhibit A, ¶ 5; Exh. B. This evidence is offered to rebut the truth of the matters asserted in Letyagin's declaration (Doc. 42-3). Even without the benefit of positive inferences, there are adequate facts in the record to support the conclusion that at least part of the infringement took place inside the United States, thus giving rise to U.S. liability. See *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 225 (S.D.N.Y. 2002) (supporting a New York based newspaper's claim of copyright infringement based upon Canadian agent's display on its Internet website because the website could be accessed from the United States).

The Defendants' infringement was on <sunporno.com>. (Docs. 1-3 - 1-9) This domain name was registered in Florida. (37-1). The domain name registration is the foundational act for all of the infringements, and the domain name registration took place in Florida. (*Id.*) Therefore, the most important portion of the infringement took place not only in the United States, but in the State of Florida. (Doc. 25 at ¶ 16-17). The Defendants sold subscriptions for profit, by using the Plaintiff's works. (Doc. 1-3 – 1-11) These subscriptions were not sold in Canadian Dollars or any other currency - they were sold in U.S. Dollars, with the default country selection being USA. *Id.*

Least speculatively, and most importantly, the act of copyright infringement is complete upon receipt of the infringing materials. See *United Feature Syndicate,* 216 F. Supp. 2d at 225; *Allarcom Pay Television Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995) (holding that a copyright infringement was not complete until a signal sent from the United States was received in Canada). In this case, Liberty's staff reviewed <sunporno.com> and viewed the Plaintiff's videos on the website. (Doc. 7 ¶¶ 4-8) Therefore, not only can we conclude that publication (and thus the completed act of infringement) took place in the United States by virtue of the fact that the website was accessible in then

United States[1], we have at least two people who were in the United States at the time that they viewed the Defendants' site while it contained the infringing material. (Docs. 7 ¶¶ 4-8; 37-2 ¶¶ 7-15)

In this case, if "N" is the number of infringements viewed in the United States, thus the number of <u>complete</u> acts of infringements in the United States, then the following is indisputably true: $N \geq 12$. There are six Corbin Fisher films at issue. (Doc. 21 ¶¶ 91-93)  Erika Dillon viewed each at least once. (*Id.*) Plaintiff's counsel viewed the films all at least once, in order to prepare the Complaint.  Thus, $N \geq 12$.  This is enough to defeat completely any argument of extraterritoriality.

Additionally, each film was viewed thousands of times.  "Noah & Mandy" was viewed 14,478 times (Doc. 1-4).  "Josh and Mandy" was viewed 98,965 times (Doc. 1-5).  "Dawson and Mandy" was viewed at least 6,300 times (Doc. 1-6).  Similarly, "Chris and Mandy," "Tanner and Mandy" and "Passionate College Gay Boys" were each viewed more than 4500, 13,000 and 34,900 times, respectively (Docs. 1-7 – 1-9).  The sheer number of views makes it a statistical impossibility that <u>none</u> of the illegal distribution took place in the United States.  Online analytics services reveal that <sunporno.com> received more than 1.5 million unique viewers from within the United States alone (Doc. # 21-2).  In fact, there is nothing in the record to support the contention that **any** of the over 135,000 aggregate infringing views took place *anywhere but* the United States, and thus absent the Defendants putting such facts in the record, they should be presumed to have taken place here as supported by the allegations in the complaint.

Absent such a showing, it would be improper for the court to infer that they all took place outside the United States. See *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988) (where Defendant argued that infringement took place in Israel, not the United States, but did not produce **evidence** of that fact, then copyright infringement judgment based upon a portion of the infringement taking place in the U.S. affirmed).  Therefore, of all of these thousands of documented views, it is reasonable to infer that **at least one** of these views, if not a large percentage (or all of them), were viewed in the United States.  Indeed, the available evidence tends to support this latter position that substantially

---

[1] *United Feature Syndicate,* 216 F. Supp. 2d at 225; *Allarcom Pay Television Ltd.*, 69 F.3d at 387.
[2] Even if the Plaintiff's complaint failed to specifically allege that part of the infringement took place in

all of the Defendants' traffic comes from the United States (Docs. 21-2, 21-3). Accordingly, if even ONE of them each were attributable to an American viewer, then $N \geq 12$.

    **C.**    **In order to apply the extraterritoriality exception, the infringement must take place <u>entirely</u> outside the United States. Since it did not, there is no extraterritorial immunity afforded to the Defendants.**

The Copyright Act's extraterritoriality rule only applies to acts of copyright infringement that take place **entirely** outside of the United States. In this case, the Defendants claim to be in "Europe" – but do not state where (Doc. 42-3 ¶¶ 2-3) – and there is no evidence that this claim is anything but a ruse. Even if the Defendants are in "Europe," the acts complained of did not take place **entirely outside** of the United States. 17 U.S.C. § 106(3) grants the owner of a copyright the exclusive right to distribute copies of the copyrighted work to the public. Courts interpret the term "distribute" in light of the statute's plain meaning and legislative history. Infringement of the distribution right occurs when there is a dissemination of copies of the Plaintiff's works. The dissemination is clearly proven by record evidence, and at least part (if not all) if that distribution took place in the United States.

In *Palmer v. Braun*, 376 F.3d 1254 (11th Cir. 2004), the mere act of distribution within the United States was a sufficient violation of the copyright owner's 17 U.S.C. § 106(3) rights that the Court had jurisdiction to adjudicate the defendant's infringement. See, also, 4-17 Nimmer on Copyright § 17.02 ("[A] distinction should be drawn between purely extraterritorial conduct, which is itself nonactionable, and <u>conduct that crosses borders,</u> so that at least a part of the offense takes place within the United States. . . . It may be concluded . . . that U.S. courts may entertain such multiterritorial infringement claims.") (emphasis added).

A recent case illustrates the fact that the extraterritoriality rule requires <u>complete</u> separation from the United States in order for it to apply. In *Columbia Pictures Indus. v. Fung*, 96 U.S.P.Q. 2d (BNA) 1620 (C.D. Cal. Dec. 21, 2009) the Central District of California was confronted by a Defendant who argued that the Plaintiff "must provide evidence that both the transferor and the transferee are located in the United States." *Id.* at *29. The court rejected that argument.

> However, United States copyright law does not require that both parties be located in the United States. Rather, the acts of uploading and downloading are each independent grounds of copyright infringement liability. Uploading a copyrighted content file to other

users (regardless of where those users are located) violates the copyright holder's § 106(3) distribution right.  Downloading a copyrighted content file from other users (regardless of where those users are located) violates the copyright holder's § 106(1) reproduction right. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001).  Accordingly, Plaintiffs need only show that United States users either uploaded or downloaded copyright works; Plaintiffs need not show that a particular file was both uploaded and downloaded entirely within the United States. *Id.* at *29-30.

The Southern District of Florida resolved a similar question in the same way in *Foreign Imported Productions and Publishing, Incorporated v. Grupo Industrial Hotelero, S.A.*, Case No. 2:07-cv-22066, *2008 U.S. Dist. LEXIS 108705* at *12-13 (S.D. Fla. Oct. 24, 2008):

> Defendants need not have copied the Infringing Video within the United States to constitute infringement in the United States. *See Palmer,* 376 Fed.3d at 1258 (finding subject matter jurisdiction where copyrighted material was copied in France but 25 copies were imported into the United States for distribution). Although the design, maintenance, and ownership of the Coco Bongo website may be outside the United States, acts of infringement are committed within the United States when United States citizens view the copyrighted material on the Coco Bongo website.

It is true that in this case the Plaintiff did not *specifically allege* the precise fact that there was an act of infringement inside the United States.  However, the Plaintiff did allege that the wrongs complained of occurred in this district. (Doc. 6 ¶ 7)  Furthermore, the Plaintiff alleged that its employees discovered the infringement.  (Doc. 6 ¶ 40).  These allegations, plus the facts in the record support the conclusion that at least part of the infringement took place inside the United States, and to the extent that the complaint fails to adequately allege this fact, the record certainly supports such a conclusion.[2]  See 4-17 Nimmer on Copyright § 17.02 ("it would seem upon a straightforward application of the statute that, regardless of how much infringing conduct may or may not occur abroad, when violation of one of the exclusive rights in copyrighted works is completed within the United States, the activity becomes actionable under domestic law.").  In this case, the Plaintiff's rights under 17 U.S.C. § 106 were violated inside the United States.  (Docs. 7, 21-2)  The Defendants illegally duplicated the Plaintiff's works in the United States.  *Id.*  They distributed them from U.S. servers.  Decl. of Jason A. Fischer ¶ 6; Exh. C.  Then

---

[2] Even if the Plaintiff's complaint failed to specifically allege that part of the infringement took place in the United States, such a specific allegation is not necessary.

they distributed them to Americans.  In fact, America is the Defendants' leading source of traffic.  Fischer Decl. ¶ 7; Exh. D.  Extraterritoriality is inapplicable here.

In a recent case in the District of Nevada, a court was confronted with a motion to dismiss on extraterritorial grounds. See *Righthaven, LLC v. Majorwager.com, Inc.*, 2010 U.S. Dist. LEXIS 115007, *14-16, 96 U.S.P.Q.2d (BNA) 1768 (D. Nev. Oct. 28, 2010).  In that case, the court considered an argument raised by defense counsel that a foreign defendant could not be held liable under the U.S. Copyright Act because the plaintiff failed to allege an act of infringement within the United States.  *Id.*  The Court wrote:

> While Plaintiff's Complaint in this case does not specifically allege that the alleged infringement occurred within the United States, when adjudicating the defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(6), all reasonable inferences from the complaint's factual allegations must be drawn in favor of the plaintiff. *Usher v. Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). The complaint does allege that the articles copied were "from a source emanating from Nevada." Furthermore, it is not difficult to infer that since Righthaven discovered the infringing material on Majorwager's website, it likely did so in its Nevada office and therefore any infringement on the part of Defendant took place within the United States. *Id.* at *15.

See also *Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1371-1372 (Fed. Cir. 2008) ("Substantial evidence supports the jury's conclusion that, by selling to customers in the United States, GlowProducts' distribution of the accused products has taken place, at least in part, in the United States.").

Unauthorized copying and public display of a copyrighted work within the United States triggers the application of U.S. copyright law. See *L.A. News Serv. v. Reuters Television Int'l*, 149 F.3d 987, 991 (9th Cir. 1998); 17 U.S.C. § 106.  The record reflects that both took place. (Doc. 24-2 at ¶ 6; 24-3 at ¶ 2) Additionally, unauthorized importation into the United States of copies acquired extraterritorially triggers the application of U.S. copyright law. *BMG Music v. Perez*, 952 F.2d 318, 319 (9th Cir. 1991) (citing 17 U.S.C. § 602(a)).

> The Court finds that in this case, the alleged act of direct copyright infringement - uploading a video from Canada to YouTube's servers in California for display within the United States - constitutes an act of infringement that is not "wholly extraterritorial" to the United States. Those cases holding that the Copyright Act requires at least one infringing act to occur entirely within the United States dealt with situations in which the infringing transmission was authorized or sent from within the U.S. but received and accessed abroad. See *Allarcom*, 69 F.3d 381; *Reuters Television*, 149 F.3d 987. In this case, however, we face the opposite scenario. The allegedly infringing act in this case began in

> Canada, where Defendant created his Grandma song video. Had Defendant stopped there, there is no doubt that the strict presumption against extraterritoriality would apply and Plaintiff would not have a claim. As noted in the Court's January 11, 2011 Order: "The creation of the video, however, occurred entirely in Canada, and thus cannot constitute copyright infringement under well-settled law. See, e.g., *Doe v. Geller*, 533 F. Supp. 2d 996, 1003 (N.D. Cal. 2008) ('United States copyright laws do not apply extraterritorially.')."
>
> The problem is that Defendant did not stop at the mere creation of the Grandma song video in Canada, but instead allegedly uploaded it to YouTube's California servers for display in the United States after agreeing to YouTube's Terms of Service agreement. Thus, according to the allegations in the SAC, Defendant's direct action led to the creation of a copy of the Grandma video on YouTube's servers in California, and to the subsequent viewing of the video by potentially thousands in the United States. Drawing all reasonable inferences in the Plaintiff's favor, as the Court must in ruling upon Defendant's motion to dismiss, Plaintiff's SAC does now sufficiently allege an act of copyright infringement within the United States. See, e.g., *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 224 (S.D.N.Y. 2002) (denying defendants' motion to dismiss copyright claim based on factual allegations, and reasonable inferences in support thereof, that "allegedly infringing material was accessible from computers within the United States and that it is prepared to prove that the defendants' alleged copyright infringement had an effect within the United States.").

*Shropshire v. Canning*, 2011 U.S. Dist. LEXIS 93705, *12-18 (N.D. Cal. Aug. 22, 2011).

If acts beginning in the United States but culminating overseas are considered to be under the purview of the copyright laws in the country of destination, as *Allarcom* and *Reuters Television* concluded, then it is logical to conclude that the allegedly infringing acts here fall within the purview of the Copyright Act, given that the acts of infringement **at least culminated** in the United States. In a similar case, *L.A. News Serv. v. Conus Commc'ns Co. Ltd.*, 969 F. Supp. 579 (C.D. Cal. 1997), the court reached the same conclusion. *Conus* held that the Copyright Act covered a Canadian broadcaster who transmitted a signal containing material that infringed a United States copyright when that broadcast signal, intended for Canadian homes, was also picked up by 8,000 televisions in the United States. *Id.* at 582-83. The court in *Conus* held that the broadcaster could be held liable under the Copyright Act even though the broadcaster never intended for the signal to reach audiences in the United States as long as there was infringement within the United States. *Id.* There is no difference between that transmission and the Defendants' unlawful distribution of the Plaintiff's works.

**D. Even if the infringement took place entirely outside the United States, an exception to the extraterritoriality rule applies to this case.**

There is no question that acts of copyright infringement that take place <u>entirely</u> outside the United States are not actionable in U.S. Courts. However, in this case, at least part of the events took place inside the United States, as discussed *supra*. Furthermore, even if this were not the case, there is an exception to the extraterritoriality rule, which would apply. See *Update Art, Inc.*, 843 F.2d at 73. In that case, the Second Circuit explained, relying on 9th Circuit law, that there is an exception to the extraterritoriality principle. "There is an exception -- when the type of infringement permits further reproduction abroad -- such as the unauthorized manufacture of copyrighted material in the United States." *Id.* (citing *Peter Starr Prod. Co. v. Twin Cont'l Films, Inc*., 783 F.2d 1440, 1443 (9 Cir. 1986); *Robert Stigwood Grp. Ltd. v. O'Reilly*, 530 F.2d 1096, 1100-01 (2 Cir.), cert. denied, 429 U.S. 848, 50 L. Ed. 2d 121, 97 S. Ct. 135 (1976)).

In this case, the principles are the same even if the technology is not. The record does not reflect that the Defendants **legally** downloaded the Plaintiff's copyrighted motion pictures. The Defendants most likely illegally used stolen passwords or stolen credit card numbers to obtain the Plaintiff's copyrighted works.

**III. Conclusion**

The extraterritoriality principle under the Copyright Act is not intended to give carte blanche to foreign infringers. Furthermore, without the benefit of discovery, we do not even know if these infringers are indeed in "Europe," nor if they are indeed in Pompano Beach, Florida. The mere fact that they claim to be in Europe is not dispositive. Nevertheless, if this court were to adopt the principle that it seems to suggest in its order to show cause, it would throw the entire copyright regime into chaos. All any infringer would need to do would be to locate outside the U.S. and then publish a website accessible in the U.S. and sell subscriptions to Americans to that website and there would be no recourse except to bring suit in that country. Doing so, quite simply, would deny justice to American copyright holders. If service of process cannot be effected in Europe, and if this Court was convinced of that fact, this Court

cannot reasonably conclude that faraway courts would be the proper place for this American small business to find justice.

The fact is that Liberty is "entitled to recover damages flowing from exploitation abroad of the domestic acts of infringement committed by defendants." See *Reuters Television Int'l*, 149 F.3d at 992 (9th Cir. 1998). In this case, as Brian Dunlap has testified in his Declaration, the Defendants could not have procured the infringing films anywhere but from the Plaintiff's website (Doc. 6). Therefore, the root of the infringing act was the illegal copying of the films in the first place. The trunk of the infringing act consisted of the publication of the infringing materials on servers based in the United States, through a domain name registered to a Florida entity. The leaves were each individual view of the infringing materials. *Reuters Television Int'l* modified the *Subafilms* decision, and that modification directly applies to this case. The Defendants can, and should, be held liable for their actions and should not escape without consequence simply because they claim to be based in "Europe," and attempting to spirit their domain names out of the country. See 4-17 Nimmer on Copyright § 17.02.

Dated: December 13, 2011                    Respectfully Submitted,

                                               *s/Jason A. Fischer*
                                       Marc J. Randazza, Esq., (625566)
                                       mjr@randazza.com
                                       Jason A. Fischer, (68762)
                                       jaf@randazza.com
                                       Randazza Legal Group
                                       2 S. Biscayne Blvd., Suite 2600
                                       Miami, FL 33131
                                       (888) 667-1113
                                       (305) 437-7662 fax

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing documents were filed electronically using this court's CM/ECF system on Decmeber 13, 2011, and are thereby served upon Mr. Mark Terry, Mr. Valentin Gurvits and Mr. Evan Fray-Witzer.  As the identity of the remaining Defendants has yet to be determined, they cannot be served.

    _s/Jason A. Fischer_
Jason A Fischer (68762)
Randazza Legal Group
2 S. Biscayne Blvd., Suite 2600
Miami, FL 33131
Telephone: (888) 667-1113
Facsimile: (305) 437-7662 fax
jaf@randazza.com